D & S UNIVERSAL MINING CO., INC., and National Energy Resources, Inc., Plaintiffs,

and

S.S. Joe Burford, Intervenor,

v.

The UNITED STATES, Defendant.

Nos. 612–80C, 348–81C.

United States Claims Court.

Sept. 16, 1986.

See also 4 Cl.Ct. 94.

G. Kellam Scott, Denver, Colo., for plaintiff in No. 612–80C.

James T. Hemphill, Jr., Washington, D.C., for plaintiff in No. 348–81C.

L. Paige Marvel, Baltimore, Md., for intervenor.

Richard W. Oehler and Michael T. Paul, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge.

### Facts

On September 29, 1979 the General Services Administration entered into a requirements contract wherein plaintiff, D & S Universal Mining, Inc., would supply coal during Fiscal Year 1980 to various sites in the Washington, D.C. area. The contractor was selected by the Small Business Administration pursuant to section 8(a) of the Small Business Act, 15 U.S.C. 637(a).

S.S. Joe Burford, as a subcontractor to D & S with a vested interest in the outcome of the litigation, moved to intervene in *D & S Universal Mining Co., Inc. v. United States*, No. 612–80C. That motion was allowed on October 26, 1981. National Energy Resources, Inc. (NER), also a subcontractor to D & S, filed suit against the United States on May 26, 1981. Later, NER moved to consolidate its case with *D & S*. Because the facts are for all practical purposes identical, the court allowed NER's motion to consolidate on September 5, 1986.

Plaintiff, D & S Universal Mining Co., Inc., a coal broker, entered into purchase orders with Burford and NER to supply coal for D & S from one or more of their mines, to destination. Shortly thereafter, Burford and NER executed other related agreements with SBA, plaintiff and the McLachlen National Bank which specified that all sums earned by D & S under its contract would be paid by defendant to the McLachlen National Bank (McLachlen).[1] McLachlen was to advance certain funds to plaintiff for operating expenses and to place all proceeds earned and received under the contract into Special Numbered Accounts and to make payment therefrom first to Burford and NER; second, to itself for the costs of administering the Special Numbered Account; third, to SBA for a judgment previously awarded SBA in unrelated litigation; and fourth, the balance to D & S. To perfect the assignments, McLachlen notified the Contracting Officer that the monies earned and to be earned by D & S had been assigned to it under the Assignment of Claims Act, 31 U.S.C. 203 (twice repealed) and 41 U.S.C. 15. The assignments directed defendant to pay all monies due or coming due under the D & S contract to the bank for distribution as outlined. Authorized officials of defendant approved the assignments.

Thereafter Burford shipped approximately 343 railroad cars of coal to defendant. Ninety-one were rejected for various reasons. Accordingly, defendant refused to pay for the 91 carloads of coal and D & S brought suit in the United States Court of Claims, now the United States Claims Court. As discovery continued, so did settlement negotiations and in early May, 1986 defendant reached settlement with D & S but not with Burford or NER. The terms of the settlement known by the court require defendant to pay $300,000 in satisfaction of defendant's claim. By Order dated May 29, 1986 this court directed that judgment be entered for D & S pursuant to RUSCC 54(b).

Left standing was the question of whether Burford could continue to press its claim

---

1. The Department of Justice and the General Services Administration were signatories to the    other supporting documents.

in this court. In the May 29, 1986 Order, the court directed Burford to file a brief addressing the question of its standing to maintain suit against the government as a subcontractor-intervenor with no apparent standing because of lack of privity of contract.

National Energy Resources, Inc., like Burford, shipped coal to defendant as part of the D & S contract with GSA, but unlike Burford, was paid for some coal delivered to defendant and claims that defendant has refused to pay NER for a substantial portion of the coal delivered under the contract.

Intervenor, Burford, and plaintiff, NER, view the settlement as detrimental to their best interests because under their Special Account Agreements they have priority for payment and if the settlement funds are paid directly to D & S there is a distinct concern that other parties, including the United States, might have superior interests in the funds to theirs. Defendant wisely has not taken steps to finalize the payment settling its dispute with D & S.

Burford asserts that throughout the time the suit was pending, except for the settlement stage, it relied upon its right to receive payment as set out in a document entitled "Authorization and Mine Description Form" and in the purchase orders between plaintiff and intervenors. Passing comment was made to the related Agreement as to Special Numbered Account and the role of the McLachlen National Bank and related documents at the time Burford's Motion to Intervene was filed so it should not come as a total shock to defendant and D & S, despite their protestations to that effect.

## Discussion

The court must determine whether intervenor Burford has standing to continue the suit and, if so, what is the effect of the related documents upon payment under defendant's settlement with plaintiff. The

court must also determine the position of plaintiff in the consolidated case of *National Energy Resources, Inc. v. United States*, No. 348–81C. The United States Court of Appeals for the Federal Circuit in *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983) provides direction. It states:

A brief examination of the judicial history of the privity doctrine in regard to subcontractor claims provides some guidance as to the parameters of this doctrine. In *Merritt v. United States*, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925), the plaintiff, a subcontractor, sued the United States to recover amounts the government had received from the prime contractor. The Supreme Court denied recovery, stating:

Plaintiff cannot recover under the Tucker Act.... The petition does not allege any contract, express or implied in fact, by the Government with the plaintiff to pay the latter ... on any basis. Nor does it set forth facts from which such a contract will be implied. [*Id.* at 340–41, 45 S.Ct. at 279]

*Johnson* at 1550.

In *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 202 Ct.Cl. 1 (1973), the Court of Claims stated:

It is clear that, unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime. *United States v. Munsey Trust Co.*, 332 U.S. 234, 241 [67 S.Ct. 1599, 1602–03, 91 L.Ed. 2022] (1947); *United States Fid. & Guar. Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973).

*Putnam*, 479 F.2d at 1337; 202 Ct.Cl. at 8.

Defendant, in its desire to protect the D & S settlement, argued for itself and D & S that the court is without jurisdiction to hear Burford's[2] case and that Burford is

**2.** Defendant's response to Burford's brief regarding jurisdiction was filed before NER filed a motion to consolidate, but the court deems the

defendant's arguments against Burford's intervenor status equally applicable to NER's posi-

without standing to argue its case. Defendant and D & S state that there are no contracts between Burford and defendant and that the only operable document is the contract between defendant and D & S, to which Burford is not a party. Burford argued that the Special Numbered Account gave it standing before this court and that, at the least, it has a contract or contract implied-in-fact with defendant thereby giving the court jurisdiction over its claim. 28 U.S.C. 1491 (1982). Burford would find the necessary privity of contract with defendant in the Special Numbered Account, as would NER.

The court is of the opinion that it has jurisdiction to hear the case and, *a fortiori*, both Burford and NER have standing before this court to argue their cases pursuant to the Assignment of Claims and the two related "AGREEMENT[S] AS TO SPECIAL NUMBERED ACCOUNT" executed by D & S, SBA, McLachlen and respectively, Burford and NER.[3] The Burford agreement states:

### AGREEMENT AS TO SPECIAL NUMBERED ACCOUNT

This Agreement entered into as of the 22nd day of October, 1979 by and between D & S Universal Mining, Inc., a Colorado corporation (herein D & S), S.S. (Joe) BURFORD, INC., a West Virginia corporation (herein BURFORD), the Small Business Administration, an agency of the United States of America (SBA), and McLachlen National Bank, a national banking association with principal offices in the District of Columbia (Bank);

WHEREAS D & S has entered into a Subcontract with SBA for the providing of a definite quantity of coal under a General Services Administration contract with SBA; and

WHEREAS, Burford has agreed to sell coal to D & S toward fulfillment of D & S's contract referred to in the preceding

paragraph and Burford desires to be secured for the payment by D & S of the coal which it supplies; and

WHEREAS, D & S by virtue of a Forbearance Agreement with SBA is indebted to SBA and SBA desires to have payment to it secured; and

WHEREAS Bank is willing to advance certain funds to D & S for operating expenses and is willing to establish special numbered accounts for the deposit of the proceeds of the coal contracts referred to above and the Bank desires to be secured as to the repayment of the advances and expenses incurred; and

WHEREAS D & S desires to see that all parties are paid and that payment is secured;

IT IS AGREED by the parties as follows:

1. D & S will assign to Bank for deposit in special numbered accounts the proceeds of all coal contracts received by virtue of the SBA 8(a) program.

2. Bank agrees to open and administer the special numbered accounts, to accept the assignment referred to in paragraph numbered 1 above and to receive the proceeds of the assignment and deposit them into the special numbered accounts as directed.

3. Burford agrees to deliver coal pursuant to the agreements it has with D & S as long as this agreement is in effect.

4. SBA agrees to forbear its actions against D & S under other agreements entered into between SBA and D & S as long as this agreement is in effect except that actions may be brought on any claims on which a limitation period may be about to expire in one year or less. Provided, however, that nothing in this section shall affect, in any way, the rights of Burford under this agreement.

5. The proceeds from this assignment after deposit into the special account for Burford are to be disbursed as follows:

---

tion as a plaintiff/subcontractor whose case has been consolidated with the case at bar.

**3.** The NER Agreement is virtually identical to the Burford Agreement and will not be repeated herein.

a. Payment to Burford for the coal delivered by reason of which a payment was made under the assignment.

b. After payment to Burford per above, payment to Bank for monies advanced by Bank to D & S for operating expenses and payment to Bank for its costs in handling the transactions under this agreement which will be charged at $10.00 per item. Provided, however, that the Bank shall not make advances of which the unrepaid principal balance shall at any time exceed $5,000.00 and repayments to the Bank of advances shall in no instance be so large as to preclude payment to SBA of 75 cents per ton out of each installment payment received by the Bank.

c. Payment to SBA after payment to Burford and Bank per items a and b above at the rate of 75 cents per ton of coal for each ton of coal delivered for which payment was received under the assignment until SBA is paid in full under its Judgment and advances per other agreements.

d. Payment of the balance remaining after payments of a, b and c above to D & S.

6. The Bank shall have no discretion in the receiving of proceeds under the Assignment nor in the payment of those proceeds under this agreement and D & S, Burford and SBA shall hold Bank harmless from any losses, claims, liability or expense including reasonable attorney's fees which shall occur unless same arise solely and directly from Bank's own willful default or negligence. Bank shall be entitled to act or rely upon advice of its counsel and acts of Bank upon such advice shall remove any negligence or willful default. It is specifically understood that the Bank does not have trust powers and may not act other than as specified herein.

This Agreement may not be terminated except in accordance with its terms and may not be amended except by execution of an Amendment by all parties hereto or by an order from a Court of competent jurisdiction. The termination of this Agreement in any fashion shall not affect the right of Burford to be paid for any coal already shipped or loaded for shipment, nor shall the termination of this agreement in any manner affect the rights of D & S and SBA to receive any payments to which they may be entitled, after payment of Burford, for coal shipped or loaded for shipment.

WHEREFORE the parties hereto have shown their agreement by affixing their hands and seals hereto.

Both agreements were signed by plaintiff, SBA, Burford and NER, respectively and McLachlen National Bank. Defendant chose to recognize the Special Numbered Account Agreement as evidenced by the fact that it executed the assignment of claims documents. *Tufaco Corp. v. United States,* 614 F.2d 740, 222 Ct.Cl. 277, (1980).

Burford and NER may very well have a separate cause of action outside the scope of this litigation, as defendant asserts, but that does not require this court to relinquish the case, thereby adding significant costs and loss of time to the parties and any other forum, because this court too has jurisdiction. Burford recognized that in general a subcontractor that is not in privity with the government has no standing to sue on its own behalf, at least before this court. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550 (Fed.Cir.1983). However, the Special Numbered Account gives Burford the jurisdiction needed in that it is, at the least, a contract implied-in-fact, and at the most an express contract between the signatories. The Federal Courts Improvement Act of 1982 states unequivocally that the "United States Claims Court shall have jurisdiction to render judgment founded ... upon any express or implied contract with the United States ..." The same logic gives NER authority to file suit in this court separate and apart from its prime contractor. Accordingly, the court retains jurisdiction because the privity rule is synonymous with a finding that there was an express or implied contract entered into by the govern-

ment and the two subcontractors. *Johnson*, 713 F.2d at 1550.

■ As to the merits of the case at bar, the court is of the opinion that as per the Assignment of Claims Act and the actions of the parties thereunder, defendant is obligated to adhere to the terms of the assignment. Defendant and D & S argue that the $300,000 settlement is outside of the scope of the assignment and the Special Numbered Account, and that defendant may make payment directly to D & S simply by stating that the settlement is not covered by the terms of the assignment and the Special Numbered Account. The court finds this argument disingenuous. This settlement, as all contract settlements, must be based at least in part upon the facts in dispute under the contract. Payment under a government contract, in the absence of any dispute is routinely made in accordance with the payment terms of the contract. When a dispute arises it may be settled by negotiation of the parties, as here, but premised upon the objective and subjective opinions of what was, and what was not done under the contract. Here, the government initially refused to pay Burford for coal because the coal shipped was not what had been contracted for. As the years passed and the coal sat in hopper cars through Washington, D.C.'s frigid winter cold spells, tropical summer heat, and spring and fall wet spells, and as D & S's, NER's and defendant's knowledgeable employees left, conditions changed. In negotiating a settlement of litigation, additional factors have to be taken into consideration. Factors such as the present and past value of the coal, litigation risks, litigation costs, etc. But the starting point was the actual coal tonnage and the contractual price per ton. The settlement figure of $300,000 had to have come from an analysis of the parties of the factors mentioned above, plus others. But the simple fact remains that any payment to D & S in settlement of the litigation was a payment under the terms of the contract, including the Assignment of Claims and the requirements of the Special Numbered Account.

Conclusion

It is the opinion of the court that, in these narrow, unique circumstances, Burford does have standing, as does NER, before this court to argue their respective positions and any settlement of the case must be made in accordance with the Assignment of Claims Act, 41 U.S.C. 15, and the Special Numbered Accounts. Plaintiff and defendant may not ignore those requirements, and the rights of Burford and NER in the interest of settling the case. The Assignment of Claims was executed by the parties to insure that Burford and NER received the monies owed to them by D & S and the court cannot permit the government and D & S to defeat that purpose in these circumstances. Any funds to be paid to D & S, including the settlement funds, must be made through the bank and paid out per the Special Numbered Accounts unless all of the signatories thereto agree otherwise.

The judgment entered by the Clerk of the Court pursuant to this court's Order of May 29, 1986 is vacated.[4] The parties, including Burford and NER, are to discuss the future course of this litigation and to report back to this court on or before October 17, 1986, as to whether they wish to litigate the claims or to attempt to settle all of the claims. Defendant, upon receipt of this order is to notify the appropriate person at the McLachlen National Bank and to furnish him a copy of this order. If McLachlen wishes to participate in these discussions it may do so without further order of the court.

IT IS SO ORDERED.

---

4. The May 29 Order was improperly dated May 29, 1985, and is herewith corrected to read May 29, 1986.